KAFTAN v KAFTAN

Docket Nos. 301075 and 301495. Submitted March 5, 2013, at Detroit. Decided April 25, 2013, at 9:10 a.m. Leave to appeal sought.

Melvin M. and Carole K. Kaftan brought actions against each other in the Oakland Circuit Court in connection with the settlement they signed during their divorce proceedings in 2001, which called for Melvin to make a series of payments to Carole through 2017 totaling approximately $7.7 million. After Melvin stopped making payments in 2009, Carole sought to recover the remaining payments due under the settlement agreement, while Melvin sought a modification or rescission of the contract because certain real estate assets he had retained under the agreement turned out to have been incorrectly valued, partially because of fraud perpetrated by a business partner. The parties both moved for summary disposition under MCR 2.116(C)(10), and Carole moved for sanctions against Melvin. The court, John J. McDonald, J., granted summary disposition in favor of Carole, but it denied her motion for sanctions. In Docket No. 301075, Melvin appealed the grant of summary disposition, and Carole cross-appealed the court's failure to impose sanctions. In Docket No. 301495, Melvin appealed the judgment awarding Carole back payments and other relief. The cases were consolidated for appeal.

The Court of Appeals *held*:

1. The trial court properly concluded that no modifications could be imposed outside those provided for in the settlement agreement itself because the agreement did not provide for any modifications absent fraud by one of the parties, did not state an intent to divide the sum of all assets equally, contained numerous disclaimers and assertions of finality, and was made by sophisticated parties. Under the terms of the agreement, fraud by a third party that caused an error in valuation of assets when the agreement was made did not constitute a mutual mistake.

2. The trial court did not abuse its discretion by rejecting Carole's request for sanctions because the case was legally and factually complicated, no Michigan case was sufficiently similar to command the result, and Melvin's arguments were not devoid of arguable legal merit.

Affirmed.

*Brooks Wilkins Sharkey & Turco, PLLC* (by *Keefe A. Brooks*), for Carole K. Kaftan.

*Dickinson Wright PLLC* (by *Timothy A. Stoepker* and *Dennis C. Kolenda*) and *Pierce Duke Farrell & Tafelski PLC* (by *Mark C. Pierce*) for Melvin M. Kaftan.

Before: CAVANAGH, P.J., and SAAD and SHAPIRO, JJ.

PER CURIAM. This case involves a dispute over the settlement signed by the parties in December of 2001, during their divorce proceedings. The agreement called for Melvin Kaftan to make a series of payments to Carole Kaftan. After Melvin stopped making payments in 2009, the parties each filed suit against the other. Carole sought to recover the remaining payments due under the settlement agreement, while Melvin sought a modification or rescission of the contract because certain real estate assets retained by him under the agreement turned out to be incorrectly valued, in part because of predivorce fraud perpetrated by a business partner. We affirm. Even assuming that the statute of limitations does not bar Melvin's arguments, he has failed to assert facts that would properly constitute a defense or claim of mutual mistake.

I. FACTS

The parties signed the property settlement agreement on December 29, 2001. The agreement did not contain a valuation of the estate. However, a financial statement prepared for Melvin, and reviewed by an expert chosen by Carole, set the value at $14,517,000. A large portion of the marital estate consisted of real estate holdings, which Melvin mostly retained under

the agreement. In return, the agreement called for him to make a series of payments to Carole through 2017, totaling $7,704,000.[1]

The property settlement agreement contains multiple indications that it was meant to permanently resolve all questions relating to the parties' marital property. It declares that the parties "are now desirous of definitely and for all times settling and determining all issues pertaining to property division . . . and all other claims or rights between them . . . ." It prohibits any amendment or modification except by further written agreement, and also does not authorize the circuit court to modify any provisions except by stipulation of the parties. The agreement does not state that the parties intended to divide their assets 50-50, and it contains no valuations of the individual properties at issue. Moreover, the agreement states that "[t]here are no representations or warranties other than those expressly herein set forth" and that each party acknowledged their right to "verification of facts" relevant to the agreement. The agreement did make provision for fraud or concealment, but only if committed by one of the parties: "The release shall not operate to release either party from any fraudulent acts, intentional nondisclosure of assets and liabilities, misrepresentations or conduct, which may become known hereafter and detrimentally affect the other party."

Melvin made all payments through 2008, but stopped making payments in 2009. When asked at his deposition why he stopped paying, Melvin responded that Carole had refused to help him cover their son's losses in a business deal. He also testified that the reason he stopped making

---

[1] This amount was divided into $2,388,000 in payments falling under section 71 of the Internal Revenue Code, 26 USC 71, and $5,316,000 in "additional property settlement."

payments was that he discovered that, through the fraud of a business partner, the real estate holdings had actually been worth only $4,936,000 in 2001, not $14,517,000 as the parties had thought at the time.

Several of the real estate projects that Melvin retained in the divorce were organized, managed, and partly owned by Rodney Robinson. According to Melvin, in 2002, after the settlement agreement was completed, he learned that Robinson was in financial difficulties. Melvin had guaranteed a number of loans for the projects he invested in with Robinson, and as these projects defaulted on their loans, banks were threatening to pursue collection efforts against Melvin. As a result, Melvin and Robinson traded properties in a number of swap agreements, beginning in July 2002, so that Melvin could completely separate his holdings from Robinson.[2]

Melvin asserts that in December 2008, he learned that Robinson had been jailed for fraud in a project unrelated to Melvin's investments. Melvin's additional investigations revealed that before the Kaftans' divorce Robinson had committed fraud regarding the properties he and the Kaftans owned. Specifically, Melvin claims that Robinson took money from some projects to pay debts for others, falsified construction lien waivers, secretly mortgaged projects, and sold some projects while continuing to list them as assets.

Melvin testified that he did not know about Robinson's fraudulent activities before December 2008. However, he also admitted at his deposition that he discovered some irregularities in 2002 while conducting the swap agreements with Robinson. Melvin testified regarding a property called Woodlands Office Park:

---

[2] For example, instead of each owning 50% of property A and property B, one would take 100% of A and the other 100% of B.

> When we went to the swap it came out [Robinson] took a nine hundred and some thousand dollar mortgage to build a building on it for himself. We were right in the midst of getting all of those documents from the bank to show that he stole that piece of land from me. In the swap he was broke. I had to take . . . about a half a million dollars that he's going to owe me.

He later added, "Well, Mr. Robinson stole it from me. We found out at the swap time." In addition, Robinson's company Land Equities had already defaulted on a loan owed to Melvin by the time of the divorce.

Melvin and Carole each filed suit against the other on September 15, 2009, and later filed motions for summary disposition under MCR 2.116(C)(10). The trial court granted summary disposition in favor of Carole, holding that Melvin's argument of mistake was barred by the statute of limitations and laches, and also that he failed to establish a mutual mistake. Carole also sought sanctions as part of her motion for summary disposition, but the trial court refused to grant them. Melvin appealed the grant of summary disposition, and Carole cross-appealed the trial court's failure to impose sanctions against Melvin.

## II. STANDARD OF REVIEW

We review de novo grants of summary disposition. *Auto Club Group Ins Co v Burchell*, 249 Mich App 468, 479; 642 NW2d 406 (2001). Equitable issues, such as arguments for rescission or reformation, are also reviewed de novo. See *Stevenson v Aalto*, 333 Mich 582, 588; 53 NW2d 382 (1952).

## III. MUTUAL MISTAKE

A mutual mistake is "an erroneous belief, which is shared and relied on by both parties, about a material

fact that affects the substance of the transaction." *Ford Motor Co v City of Woodhaven*, 475 Mich 425, 442; 716 NW2d 247 (2006). Carole relies primarily on two cases to argue that there is no mutual mistake in this case. In *Marshall v Marshall*, 135 Mich App 702; 355 NW2d 661 (1984), a husband sought to modify a property settlement agreement after stocks that he received in the agreement later sold for less than he expected. Similarly, in *Smith v Smith*, 292 Mich App 699; 823 NW2d 114 (2011), a wife sought to modify a settlement agreement after the value of an individual retirement account (IRA) assigned to her husband under the contract increased substantially. In each case, the court denied relief because the "mistake" involved only the final selling price of the stocks and the IRA, and thus was external to the contract.

Melvin responds that these cases involved changes in value postdivorce while the instant case involves a mutual error in valuation at the time of the property settlement. We agree that a postdivorce fluctuation in value more plainly falls outside the parameters of mutual mistake. However, under the terms of this settlement agreement, the instant circumstances do not constitute a mutual mistake. As described earlier, the agreement did not provide for any modifications absent fraud by one of the parties, did not state an intent to divide the sum of all assets equally, and contained numerous disclaimers and assertions of finality.

A similar scenario was recently considered by the New York Court of Appeals[3] in *Simkin v Blank*, 19 NY3d 46; 945 NYS2d 222; 968 NE2d 459 (NY, 2012). In that case, part of the marital estate being divided consisted of an investment account that, because of

---

[3] The highest appellate court in New York is the Court of Appeals, rather than the Supreme Court.

Bernard Madoff's Ponzi scheme, was later determined to have been worth far less than the parties believed at the time of their agreement. The trial court had held that a cause of action for mutual mistake was permitted under the circumstances. However, the Court of Appeals held that although the Ponzi scheme was ongoing at the time the agreement was signed, the situation was more akin to cases in which a marital asset unexpectedly loses value after dissolution of a marriage, and therefore did not constitute a mutual mistake. *Id.* at 55. The court noted that the agreement, like the one in this case, did not explicitly state that the property was to be divided equally, nor did it explicitly value the relevant asset account. *Id.* at 54.

Though it is not controlling, we find the New York Court of Appeals' reasoning in *Simkin* to be persuasive, especially given the factual similarity to the present case. In this case, as in *Simkin*, the husband bargained to retain property that he now asserts was affected by a third party's fraud at the time of the divorce. The agreement here, like in *Simkin*, does not place a specific value on the real estate or indicate that it must be divided equally. Further, the agreement evinces an intent by the parties to permanently resolve the distribution of their marital property. Melvin agreed to pay Carole a sum certain, without regard to changes in the real estate market in general or to factors affecting only his specific holdings.

In *Smith*, this Court noted:

> The values of the retirement accounts were stated in fixed terms. It is well known that stocks fluctuate on a daily basis. The parties were free to fix the values of the accounts at any time. They could have fixed the value at the time the divorce complaint was filed or at the time the divorce judgment was entered. They could have expressly provided that the division of the retirement accounts was subject to

modification for market fluctuations. However, they did not do any of this. [*Smith*, 292 Mich App at 704-705].

Similarly, in the present case the parties could have included terms in the settlement agreement providing for the payments to Carole to be adjusted based on changes in the value of the real estate properties or qualifying Melvin's promise to pay in the event of any unforeseen or unforeseeable circumstances. However, while the agreement contains provisions allowing for adjustment of the property settlement in case of fraud by the parties themselves, it contains no such provisions for fraud by a third party or unknown inaccuracies in either or both of the parties' assessment of value.

Accordingly, we conclude, as did the trial court, that given the detailed nature of the written agreement between sophisticated parties, we may not impose modifications outside those provided for in the agreement itself.

### IV. SANCTIONS

Carole's motion for summary disposition included a request for sanctions that the trial court denied. We review a trial court's decision regarding sanctions for an abuse of discretion. *Richardson v Ryder Truck Rental, Inc*, 213 Mich App 447, 450; 540 NW2d 696 (1995).

The trial court did not abuse its discretion by rejecting Carole's request for sanctions. This case was complicated, both legally and factually, and no Michigan case was sufficiently similar to command without question the result we have reached. Though Melvin's arguments ultimately failed, they were not devoid of arguable legal merit. *Kitchen v Kitchen*, 465 Mich 654, 662-663; 641 NW2d 245 (2002); MCL 600.2591(3).

V. CONCLUSION

The trial court correctly ruled that Melvin failed to state a claim or defense of mutual mistake. Summary disposition in favor of Carole was therefore appropriate. The trial court did not abuse its discretion by denying Carole's request for sanctions.

Affirmed.

CAVANAGH, P.J., and SAAD and SHAPIRO, JJ., concurred.