# STATE OF MICHIGAN

# COURT OF APPEALS

CAROL SUE CLARK,

        Plaintiff-Appellee,

v

PROGRESSIVE INSURANCE COMPANY,

        Defendant-Appellant.

and

SAKINA FATIMA AL-AMIN, JASMINE
DENISE RIVERS, GENA IRENE RELLIAS, JON
WILLIAMS, MOHAMED BARAKAT ALY-
KHALAFALLA

        Defendants.

FOR PUBLICATION
March 5, 2015
9:05 a.m.

No. 319454
Washtenaw Circuit
LC No. 12-000385-NI

Before: SAAD, P.J., and OWENS and K. F. KELLY, JJ.

SAAD, P.J.

## I. NATURE OF THE CASE

On November 5, 2013, plaintiff, who suffered injuries in two car accidents, settled her personal injury protection ("PIP") claim in an agreement with defendant Progressive Insurance Company ("Progressive"), that provided that all PIP benefits incurred as of that date would be settled in exchange for a $78,000 payment from Progressive. Days after she made the agreement, plaintiff attempted to void this universal, binding settlement by asserting that she and her lawyer were unaware of a $28,000 benefit she incurred several months before the settlement, and that the charge had only recently come to her attention.[1] She claimed that because

---

[1] As we explain infra, plaintiff incurred the $28,000 charge in May 2013, when she had shoulder surgery at a medical facility. Though she received a bill from the surgeon that performed the shoulder surgery prior to settlement on November 5, 2013, she says she did not receive the $28,000 *facility* bill for her May 2013 use of the medical facility until three days after the November 5, 2013 settlement.

-1-

Progressive was aware of the billing (and she was not), the settlement should not include the $28,000 charge, as she would not have settled for $78,000 had she know about the $28,000 charge at the time of settlement. She did not tell the trial court (and does not tell our Court on appeal) how Progressive or Progressive's counsel could have divined what she and her lawyer may or may not have considered, or known, or risked, in making the decision to settle for $78,000. Yet the trial court agreed with plaintiff's argument, and held that the settlement did not include the $28,000 bill.

When plaintiff settled the case, she or her lawyer could have demanded that the settlement only include a specific list of PIP benefits incurred to date, rather than *all* PIP benefits incurred to date.[2] But neither she nor her lawyer made such a demand. Alternatively, because her claims involved continuing medical treatment and numerous related charges over long periods of time, plaintiff and her lawyer could have conditioned any settlement by specifying that if any charges incurred before the date of settlement came to light *after* the settlement, the settlement could be reopened to address such a charge. But again, neither plaintiff nor her lawyer took this precaution. There are many other ways plaintiff or her lawyer could have settled her claim besides a universal settlement that wiped the slate clean of any claims incurred prior to the date of settlement. But they did not do so. Instead, they settled for a complete waiver of claims for $78,000, and Progressive paid this sum to buy its peace and achieve finality in this litigation.

Having failed to protect her interests,[3] and plaintiff's trial lawyer having failed to protect his client's interests,[4] plaintiff now claims that the settlement should be set aside because Progressive (or its counsel) should have asked plaintiff, before the settlement, if she had considered the $28,000 charge—even though it is conjecture to allege that Progressive (or its counsel) knew that plaintiff lacked knowledge of this charge.

If this claim sounds strange, that's because it is. Why? Because were we to agree with plaintiff's theory—which she does not articulate legally—then this case would stand for the unprecedented proposition that an adversary in litigation has a duty to ensure that his opponent considered all relevant factors before making a settlement decision. And, were we to credit the theory that opposing counsel had a duty to notify plaintiff of the $28,000 charge, then this case

---

[2] Indeed, plaintiff had compiled such an itemized list of expenses in preparation for her lawsuit. But she did not limit the settlement to this specific list, despite the fact that she had the option to do so.

[3] Of course, it is entirely possible that plaintiff *did* protect her interests—because we do not know whether, in her consideration of the November 5, 2013 settlement, plaintiff thought about the risk that the settlement would preclude claims she incurred prior to November 5, 2013, but of which she lacked knowledge as of the settlement date.

[4] Again, it is entirely possible that plaintiff's trial attorney *did* protect her interests—because we do not know whether, in his advice on the November 5, 2013 settlement, he explained to plaintiff the risk that the settlement would preclude claims she incurred prior to November 5, 2013, but of which she lacked knowledge as of the settlement date.

would stand for the novel theory that opposing counsel has a duty to do what is in fact, law, and professional obligation, the duty of plaintiff's lawyer. It is the obligation of plaintiff's attorney to ensure his client knows that a settlement, like the one at issue here, encompasses all claims. If plaintiff or her lawyer had any doubt about such an agreement, it was the responsibility of plaintiff's lawyer to demand a different kind of settlement.

Yet, plaintiff instead says the lawyer for her adversary (or her adversary itself) should advise her of relevant information before settlement. To shift what is rightly the obligation of plaintiff's attorney to opposing counsel or the defendant would fly in the face of the adversarial nature of litigation, and compromise a lawyer's obligation to zealously represent his client—and his client alone—without any conflicts.

For these reasons, which we explain below, we reject plaintiff's novel theories to avoid the agreement she freely entered into with the advice of counsel. The trial court's unwarranted rewriting of the parties' settlement agreement is reversed, and we remand for entry of an order to enforce the settlement agreement.

## II. FACTS AND PROCEDURAL HISTORY

In 2011, plaintiff was involved in two car accidents in as many months. She suffered injuries in both accidents, and damaged her left shoulder and back. Though Progressive, plaintiff's insurer, initially paid for her medical treatment, it terminated her benefits in October 2011. Plaintiff filed suit against Progressive in the Washtenaw Circuit Court,[5] and alleged that Progressive improperly denied her payments of PIP benefits and underinsured/uninsured motorist benefits in violation of Michigan's No Fault Act, MCL 500.3101 *et seq*. In May 2013, during the course of litigation, plaintiff received shoulder surgery at Synergy Spine & Orthopedic Surgery Center ("Synergy"). She says she received a billing statement from the doctor who performed the surgery, but alleges that she did not receive a billing statement from Synergy for use of the facility.

Prior to trial, plaintiff and Progressive reached a settlement. In an email exchange in early November 2013, the parties agreed to a $78,000 "global settlement" for plaintiff's PIP and underinsured/uninsured motorist claims. Progressive's adjuster explicitly stated, and plaintiff's trial attorney unequivocally agreed, that the PIP settlement "would be for all benefits to date." Plaintiff's trial attorney informed the trial court of the settlement on November 5, 2013.

Three days later, plaintiff asserts that her trial attorney received a $28,942 facility bill from Synergy for her May 2013 shoulder surgery. Plaintiff's lawyer contacted Progressive, claimed neither he nor plaintiff had knowledge of Synergy's charges, and said he would not have settled the suit for $78,000 had he or plaintiff known about this charge. He also alleged that Progressive was aware of the $28,942 statement, and had negotiated over this bill with Synergy at some point from May to November 2013. Plaintiff's attorney asked Progressive to confirm

---

[5] The other defendants include the drivers of the other cars involved in the 2011 accidents, and they are not relevant to this appeal.

that the settlement agreement excluded the Synergy charges, and stated that if the agreement did not exclude the charges, the settlement was void.

Though it is unclear what response, if any, Progressive gave to plaintiff's trial attorney, Progressive notified Synergy on November 14, 2013 that plaintiff and/or her attorney were responsible for the charges, and refused payment for the bill. Soon after, Progressive filed a motion to enforce the settlement agreed to by the parties on November 5, 2013. Progressive implicitly argued that the settlement—which plaintiff agreed to and could not void—included all charges to date, which necessarily included the $28,942 Synergy invoice, because plaintiff incurred the charge well before the date of the settlement agreement.

Plaintiff filed a response, and asserted that the settlement agreement could not include Synergy's $28,942 bill because: (1) plaintiff had no knowledge of the bill prior to the settlement agreement; and (2) Progressive, which was aware of the charges, provided her with no notice of them.[6] Plaintiff asked the court to take defendant's motion under advisement, and conduct a settlement conference to address the above issues.

After a hearing on Progressive's motion, the trial court, in written order, stated that the $28,942 Synergy invoice "was not part of the settlement agreement" and could be pursued through separate litigation. In all other respects, the trial court ruled that the "parties' settlement agreement . . . shall remain in full force and effect and is a final agreement in this case."

On appeal, Progressive makes the same argument as it did below: namely, that the parties made a valid settlement agreement on November 5, 2013 that encompassed all of plaintiff's incurred PIP "benefits to date." As a result, it says the trial court erred when it held that plaintiff could pursue Synergy's charges—which she incurred in May 2013—through separate litigation. Plaintiff again argues that the November 5, 2013 settlement agreement could not have included Synergy's charges, as plaintiff had no knowledge of them, and the agreement was intended to settle a specific set of claims of which plaintiff had knowledge.

### III. ANALYSIS

#### A. LEGAL STANDARDS

##### 1. CONTRACT PRINCIPLES

---

[6] Notably, plaintiff does not dispute that the November 5, 2013 email exchange constitutes a valid settlement agreement. Nor does plaintiff claim that her trial attorney lacked authority to settle her suit for her via this email exchange. See, for example, *Nelson v Consumers Power Co*, 198 Mich App 82, 85–86; 497 NW2d 205 (1993), and *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 455 n 1; 733 NW2d 766 (2006). Accordingly, the email exchange is a valid settlement agreement per MCL 450.837, and plaintiff's trial attorney had the authority to make the settlement for her.

"The existence and interpretation of a contract are questions of law reviewed de novo." *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006).

"An agreement to settle a pending lawsuit is a contract, governed by the legal rules applicable to the construction and interpretation of other contracts." *Reicher v SET Enterprises, Inc*, 283 Mich App 657, 663; 770 NW2d 902 (2009). "Before a contract can be completed, there must be an offer and acceptance. Unless an acceptance is unambiguous and in strict conformance with the offer, no contract is formed. Further, a contract requires mutual assent or a meeting of the minds on all the essential terms." *Kloian*, 273 Mich App at 452–453 (internal citations and quotation marks omitted).

"The goal of contract interpretation is to read the document as a whole and apply the plain language used in order to honor the intent of the parties." *Greenville Lafayette, LLC v Elgin State Bank*, 296 Mich App 284, 291; 818 NW2d 460 (2012). "If the language of the contract is clear and unambiguous, it must be enforced as written." *McCoig Materials, LLC v Galui Construction, Inc*, 295 Mich App 684, 694; 818 NW2d 410 (2012). "Parties are presumed to understand and intend what the language employed [in a contract] clearly states." *Twp of Chestonia v Twp of Star*, 266 Mich App 423, 432; 702 NW2d 631 (2005).

## 2. THE FINALITY OF SETTLEMENT AGREEMENTS

As a general rule, settlement agreements are "final and cannot be modified." See *Smith v Smith*, 292 Mich App 699, 702; 823 NW2d 114 (2011). This is because settlements are favored by the law, and therefore will not be set aside, except for fraud, mutual mistake, or duress. *Streeter v Mich Consol Gas Co*, 340 Mich 510, 517; 65 NW2d 760 (1954).

"A mutual mistake is 'an erroneous belief, which is shared and relied on by both parties, about a material fact that affects the substance of the transaction.' " *Kaftan v Kaftan*, 300 Mich App 661, 665–666; 834 NW2d 657 (2013), quoting *Ford Motor Co v City of Woodhaven*, 475 Mich 425, 442; 716 NW2d 247 (2006). A "mutual mistake" is not a mere error or misunderstanding—it is an *extreme* mistake that must be "so material that . . . it goes to the foundation of the agreement." *Simkin v Blank*, 19 NY3d 46, 52; 945 NYS2d 222; 968 NE2d 459 (2012).[7] And, needless to say, a mutual mistake must be *mutual*—it is not enough for one party

---

[7] Cases from foreign jurisdictions are not binding, but can be persuasive. *People v Campbell*, 289 Mich App 533, 535; 798 NW2d 514 (2010). See also 1 Restatement Contracts, 2d, § 154, pp 402–403:

A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

to claim mistake, when the other party was aware of the alleged "mistake" at issue. See *Kaftan*, 300 Mich at 665–666.[8]

As such, "one who signs a [settlement] cannot seek to avoid it on the basis that . . . he supposed that it was different in its terms." *Nieves v Bell Indus, Inc*, 204 Mich App 459, 463; 517 NW2d 235 (1994). More specifically, a party cannot void a settlement agreement "merely because [he] has had a 'change of heart,' "[9] nor can he do so "merely because [his] assessment of the consequences [of the settlement] was incorrect." *Rose v Rose*, 289 Mich App 45, 62; 795 NW2d 611 (2010).

### 3. PIP BENEFITS

PIP benefits include "all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." MCL 500.3107(1)(a). Under MCL 500.3107(1), a PIP claimant must show that the claimed expenses are: "(1) . . . for an injured person's care, recovery, or rehabilitation, (2) . . . reasonably necessary, (3) . . . incurred, and (4) . . . reasonable." *Douglas v Allstate Ins Co*, 492 Mich 241, 259; 821 NW2d 472 (2012).

An insured "incurs" an expense under MCL 500.3107(1) when he becomes "liable" for it, namely when he is "responsible or answerable in law; [or] legally obligated" to pay that expense. *Bombalski v Auto Club Ins Ass'n*, 247 Mich App 536, 543; 637 NW2d 251 (2001). An insured becomes liable for an expense when he accepts the medical treatment for which he (or his insurer) is being charged. *Shanafelt v Allstate Ins Co*, 217 Mich App 625, 638; 552 NW2d 671 (1996); see also *Harris v Auto Club Ins Ass'n*, 494 Mich 462, 468–469; 835 NW2d 356 (2013) (discussing our Court's summation of *Bombalski* and *Shanafelt*'s interpretations of when an insured "incurs" an expense under MCL 500.3107(1)).[10]

### B. APPLICATION

### 1. THE SETTLEMENT AGREEMENT

Here, the parties agreed to a settlement in a series of clear, unambiguous emails exchanged on November 5, 2013, which state that the settlement included all PIP "benefits

<div style="border-top: 1px solid;"></div>

             (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

[8] See also *Teeter v Teeter*, 332 Mich 1, 4; 50 NW2d 716 (1952) ("[m]isunderstanding by the plaintiff alone does not present a reason for the intervention of a court of equity").

[9] *Vittiglio v Vittiglio*, 297 Mich App 391, 399; 824 NW2d 591 (2012).

[10] Plaintiff's citation to the discussion of "incur" included in *Duckworth v Continental Nat'l Indemnity Co*, 268 Mich App 129; 706 NW2d 215 (2005) is inapposite. In *Duckworth*, the plaintiff, a Canadian, received treatment from a hospital in Ontario, which provided medical services "without charge." *Id*. at 135. Plaintiff therefore never became "liable" for the medical treatment he received, and did not "incur" the expenses under MCL 500.3107(1).

[incurred] to date." Plaintiff incurred the $28,942 expense from Synergy in May 2013, when she had shoulder surgery at Synergy's facilities. The cost of using Synergy's facilities for plaintiff's shoulder surgery is a PIP benefit. Synergy's invoice for $28,942 is thus included in the November 5, 2013 settlement, which, again, encompassed all PIP benefits incurred to date. The trial court therefore erred when it held that the $28,942 was not a part of the settlement agreement, and that plaintiff could pursue this sum through separate litigation against Progressive.

Plaintiff's attempts to avoid this obvious outcome must be rejected under Michigan law. As noted, settlements are not set aside, unless a party shows fraud, duress, or mutual mistake. *Streeter*, 340 Mich at 517. Plaintiff does not allege fraud or duress. And though plaintiff does not speak explicitly in these terms, her suggestion that there was mutual mistake in the formation of the settlement is without merit.

Specifically, plaintiff says that the November 5, 2013 settlement agreement could not have included Synergy's $28,942 charge, as plaintiff had no knowledge of it, and the agreement was intended to settle a specific set of claims of which plaintiff had knowledge. This assertion is not a "mutual mistake" for two reasons: (1) Progressive supposedly had knowledge of the alleged "mistake," meaning that it cannot be "mutual"; and (2) plaintiff's lack of knowledge of the $28,942 Synergy billing cannot be a "mistake" in the context of the settlement agreement's plain terms. Moreover, the fact that she and her lawyer knew of the charge for the surgery undermines any claim of mistake about related charges.

Again, "[a] mutual mistake is 'an erroneous belief, which is shared and relied on by both parties, about a material fact that affects the substance of the transaction.'" *Kaftan*, 300 Mich App at 665–666. Here, plaintiff explicitly alleges that Progressive had knowledge of $28,942 charge from Synergy when it made the settlement agreement. It follows that any "mistake" involving the Synergy bill cannot be "mutual," because it was not "shared and relied on by both parties,"[11] and thus cannot serve as the basis for invaliding the settlement agreement. *Streeter*, 340 Mich at 517.

More importantly, what plaintiff alleges—her unilateral lack of knowledge of the Synergy bill—is not a "mistake" in the context of the settlement agreement.[12] Again, the

---

[11] *Kaftan*, 300 Mich App at 665–666.

[12] In any event, plaintiff's protestations that she had no knowledge of the Synergy bill—or the potential for a bill from Synergy—ring hollow. Plaintiff obviously knew that she had shoulder surgery in May 2013, and she and her attorney obviously knew that an agreement signed in November 2013 that covered all PIP benefits incurred "to date" would encompass the May 2013 shoulder surgery. The fact that plaintiff included the billings from the surgeon who performed the surgery in her lawsuit against Progressive is yet another reason to discredit her and her trial lawyer's claim that they had no knowledge of Synergy's $28,942 charge. It is common practice for doctors to perform operations in facilities they do not own, and for the billing on their work and the facility use to be separate charges. Plaintiff's trial attorney was undoubtedly aware of this practice, and should have noticed that plaintiff had received a bill from the doctor who

-7-

settlement explicitly included all PIP benefits *incurred to date*. The presence of the phrase "to date" in the agreement obviously means that the settlement was not an itemized settlement for specific expenses—instead, it was a "global settlement" for all of the PIP expenses plaintiff had incurred to that point. Plaintiff incurred the $28,942 charge from Synergy in May 2013 when she had shoulder surgery at Synergy's facility, well before the November 5, 2013 settlement.

Accordingly, it is not possible for plaintiff to have not contemplated expenses related to her May 2013 shoulder surgery when she agreed, on November 5, 2013, to a settlement that explicitly encompassed all PIP benefits incurred as of that date. Plaintiff and her attorney "are presumed to understand and intend what the language employed"[13] in the settlement agreement clearly states, and cannot now seek to void its plain terms because their "assessment of the consequences [of accepting the settlement] was incorrect." *Rose*, 289 Mich App at 62. In other words, plaintiff and her attorney may have made a mistaken judgment or an erroneous assumption, but this is not a "mistake" as defined in the law regarding mutual mistake.[14]

## 2. OBLIGATIONS OF PLAINTIFF'S ATTORNEY

In essence, plaintiff's attempt to invalidate the settlement agreement is a misguided effort to force Progressive or its counsel to perform a duty that should have been performed by her trial attorney. Before a plaintiff settles a case for all charges incurred to date, it is incumbent upon the plaintiff's attorney to ensure that he and his client consider all possible claims, so that the client makes an informed settlement.[15] It is the lawyer's professional duty to ensure that his client is fully advised and aware of all the ramifications of such a settlement. And here, this means that plaintiff's trial attorney should have advised her that the settlement at issue wiped the slate clean prior to November 5, 2013.

This professional obligation is the core duty of the plaintiff's lawyer—not the opposing party or its counsel. If the plaintiff's lawyer fails to fulfill this obligation—and does not ensure that he and his client consider all possible claims before signing a settlement agreement—the lawyer cannot shift this responsibility to the opposing party or opposing counsel. To do so would ignore the nature of contested litigation and the adversarial process, as well as the obligations of opposing counsel, which entail zealous representation of *his* client, not consideration of whether the plaintiff has thought of all the possible implications of a settlement

---

performed the shoulder surgery, but not from the facility where the surgery took place (if plaintiff actually did not receive a bill from Synergy).

[13] *Twp of Chestonia*, 266 Mich App at 432.

[14] To repeat: "A mutual mistake is 'an erroneous belief, which is shared and relied on by both parties, about a material fact that affects the substance of the transaction.'" *Kaftan*, 300 Mich App at 665–666.

[15] See MRPC 1.4(b), comment ("[f]or example, in negotiations where there is time to explain a proposal, the lawyer should review all important provisions with the client before proceeding to an agreement").

agreement.[16] Furthermore, such an expectation would turn the law of the attorney-client relationship on its head. If the plaintiff or his lawyer have any concern that there might be future (and unknown) expenses not included in settlement agreement, then the lawyer should include express language in the agreement that the settlement may be amended to provide for potential charges not included on a specific list. This obligation is the fundamental professional duty of any lawyer in such a case, and one that cannot be shifted to an opponent or its counsel when a lawyer (or his client) decides after the fact that he does not like the settlement to which he agreed.

Here, plaintiff seeks to engage in exactly this sort of obligation shifting: because her trial attorney did not consider that she might face additional (and perhaps unknown) charges[17] for PIP benefits incurred before November 5, 2013—i.e., the $28,942 Synergy billing—she argues that Progressive had a duty to inform her of this billing during the settlement negotiation. Of course, Progressive has no such duty. Progressive, as a defendant in litigation, is in an adversarial position with plaintiff, and, as such, has every right to protect its interest and to expect that courts will uphold a settlement freely entered into by the parties. Progressive paid to buy its peace, not to advise plaintiff and her lawyer on how to settle a case. Were we to accept the proposition advanced by plaintiff, we would undermine the finality of settlements, and, perhaps, place opposing counsel in the untenable and conflicted position of advising two parties: his client on how best to settle a claim, and his opponent on what claims to include in a settlement.[18] This we cannot and will not do.

Under Michigan law, neither Progressive nor its counsel had any duty to inform plaintiff of possible claims she might have made regarding the $28,942 Synergy billing, or to advise her to include those claims in the November 5, 2013 settlement.

---

[16] See MRPC 1.3, comment ("[a] lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf").

[17] In shifting this obligation to Progressive and its counsel, plaintiff also seeks to impose an unrealistic duty on both parties. It is not possible for Progressive or its attorney to know exactly what settlement strategy plaintiff and her attorney adopted during the settlement negotiations. Nor is plaintiff's knowledge about claims that she has already incurred relevant in a settlement agreement that encompasses *all benefits incurred to date*. Settling all claims for benefits incurred to date carries the risk that the plaintiff will sign away claims to benefits she has already incurred, but of which she is unaware.

As such, one expects plaintiff and her trial counsel *did* discuss the possibility that she had incurred other, unknown PIP benefits before November 5, 2013—but decided to settle her claims anyway, because they believed $78,000 to be a favorable amount. It is contrary to both the attorney-client relationship and common sense to require Progressive and its counsel to divine the content of plaintiff's settlement negotiations, and inform plaintiff and her attorney of other claims that she might not have considered.

[18] See MRPC 1.7(a), comment ("[l]oyalty is an essential element in the lawyer's relationship to a client").

## IV. CONCLUSION

The trial court erred when it held that the Synergy invoice for $28,942 is not subject to the settlement agreement and may be the subject of separate litigation. The settlement agreement encompasses the $28,942 charge, and we remand to the trial court for entry of an order to enforce the settlement agreed to by the parties on November 5, 2013.

Reversed and remanded. We do not retain jurisdiction.

/s/ Henry William Saad
/s/ Donald S. Owens
/s/ Kirsten Frank Kelly