# STATE OF MICHIGAN

# COURT OF APPEALS

---

In re FRANK M. LAMBRECHT, JR., TRUST.

---

FRANK M. LAMBRECHT III,

        Petitioner-Appellant,

and

MARY ELLEN TURCHAN, MELANIE RAE
KRIST, ROBERT BIRMINGHAM, and VANGEL
DIMANIN,

        Other Parties,

v

VICTORIA LAMBRECHT and DEBORAH
ANNE LAMBRECHT,

        Respondents-Appellees.

UNPUBLISHED
September 20, 2018

No. 339632
Oakland Probate Court
LC No. 2012-346116-TV

---

Before: TUKEL, P.J., and BECKERING and SHAPIRO, JJ.

PER CURIAM.

Petitioner Frank M. Lambrecht III ("Frank III") appeals the probate court's order denying his petition for relief from an earlier order that ratified and approved a settlement agreement arising from a challenge to the validity of an amendment to the Frank M. Lambrecht, Jr., Trust. The probate court denied Frank III's petition for relief under MCR 2.612(C)(1)(a) (mistake), (b) (newly discovered evidence), (e) (judgment no longer equitable), and (f) (any other reason justifying relief), and dismissed the petition with prejudice. We affirm.

## I. CASE HISTORY

Frank M. Lambrecht, Jr. (the "grantor"), is the father of two sons, Frank III and David Lambrecht. The grantor executed a trust in 1997, which he amended in 2007. David died in early 2012, survived by his two daughters, respondents Deborah Lambrecht and Victoria Lambrecht Sartor (collectively referred to as the grantor's "granddaughters"). According to the

-1-

parties, in either late 2011 or early 2012 the grantor suffered a stroke and became blind. In 2012, Frank III and the grantor's girlfriend were appointed as the grantor's co-guardians; a conservator was also appointed. Also in 2012, after David Lambrecht's death, attorney David Johnston petitioned the probate court to validate an unsigned second amendment and restatement ("the amendment") to the grantor's trust, which the grantor allegedly executed in 2008. Johnston stated that he drafted the amendment in 2008 at the grantor's request, and instructed the grantor to sign the document and have his signature notarized. However, neither Johnston nor Frank III could locate a signed copy of the amendment. Johnston's petition to validate the unsigned amendment identified himself as counsel for the grantor's conservator, but he filed the petition before a conservator was formally appointed. The petition was signed by a successor trustee to the grantor's trust. The probate court entered an order granting the petition, thereby validating the amendment to the grantor's trust.

Relevant to this appeal, the most significant modification in the amendment was that it altered the plan for distributing the remainder of the grantor's trust estate upon his death. Before the amendment, the remainder of the trust estate was to be divided equally between the grantor's two sons, Frank III and David, and if one child predeceased the grantor, that child's share would be distributed to the child's living children (i.e., the grantor's grandchildren). Under the amendment, however, if one son predeceased the grantor, the surviving son would receive the entire residue. In other words, the granddaughters, as the surviving children of the grantor's deceased son David, would no longer be entitled to any portion of the trust residue upon the grantor's death. Instead, Frank III, as the grantor's lone surviving son, would receive the entire trust residue upon the grantor's death.

In 2015, the granddaughters filed a petition to vacate the 2012 order that had validated the amendment to the trust. Although the granddaughters had notice of the 2012 trust petition, they alleged that Johnston misrepresented himself as the grantor's attorney and that he did not disclose that a guardian and conservator had been appointed for the grantor. The granddaughters believed Johnston's statements that he was acting in the grantor's best interests and therefore did not object or participate in the proceedings. They alleged that in late 2014, they first learned that a guardianship and conservatorship had been established for the grantor and that the amendment to the grantor's trust had been validated by the probate court. The granddaughters raised other concerns with 2012 proceedings, including that no one produced a signed amendment and that there was no evidence that the grantor ever notarized the document.

The record is not entirely clear, but it appears that in 2015 the probate court appointed Joseph Ehrlich as the grantor's attorney because of concerns about the representation of the grantor's interests. Around that time, the probate court removed Frank III and the grantor's girlfriend as the co-guardians and removed the grantor's conservator. The probate court appointed the grantor a new temporary guardian and special conservator.

Ehrlich, as the grantor's appointed counsel, argued that the probate court should hold an evidentiary hearing to resolve questions pertaining to the validity of the amendment that were not addressed in 2012. Ehrlich raised several questions pertaining to the grantor's competency to execute the amendment and to the suspicious circumstances regarding Johnston's 2012 petition to validate it. Although the probate court scheduled an evidentiary hearing to resolve the issues related to the validity of the amendment, the parties instead pursued mediation, which led to a

negotiated settlement agreement. The parties to the agreement were: the grantor by and through Ehrlich and the special fiduciary, Frank III, the granddaughters, and the successor trustee. Under the settlement, upon the grantor's death, his granddaughters are to receive 42 percent of the trust residue and Frank III the remaining 58 percent. The parties agreed that there would be no more challenges to the validity of the amendment. In October 2015, the probate court entered an order ratifying and approving the settlement, and another order prohibiting further challenges to the amendment.

The grantor died in January 2016. Frank III asserts that after the grantor's death, he found a signed copy of the amendment in the grantor's desk in the grantor's bedroom.[1] In an affidavit, Frank III averred that he never previously looked for the signed document in the grantor's desk during his period of co-guardianship because the family regarded uninvited entry into the grantor's bedroom as a "great violation." Frank III filed a petition seeking relief from the 2015 order ratifying and approving the settlement. The petition sought relief under MCR 2.612(C)(1). The parties filed competing motions for summary disposition. The probate court directed the parties to engage in further discovery and then file supplemental briefs.

Frank III argued that at the time of the settlement the parties shared the mistaken belief that there was no signed amendment and that this belief was the reason they each entered into the settlement. Conversely, Ehrlich, the grantor's court-appointed counsel in the 2015 proceedings, testified at deposition that the dispute over the validity of the amendment was not based solely on the lack of a signed copy of the amendment. Rather, the validity of the amendment also involved "a plethora" of other issues pertaining to the circumstances in which the amendment was allegedly executed and validated. The probate court agreed that there were "other issues," apart from the absence of a signed copy of the amendment that led to the settlement. Therefore, the probate court rejected Frank III's mutual mistake argument. The probate court also declined to grant Frank III relief on the ground of newly discovered evidence. For those reasons, the probate court denied Frank III's petition for relief from the 2015 settlement agreement and order ratifying and approving that agreement, and it dismissed Frank III's petition with prejudice. The probate court denied Frank III's motion for summary disposition and granted the granddaughters summary disposition under MCR 2.116(I)(2) (nonmoving party entitled to judgment). Frank III now challenges that decision.

## II. STANDARD OF REVIEW

We review de novo a probate court's grant or denial of summary disposition. *In re Casey Estate*, 306 Mich App 252, 256; 856 NW2d 556 (2014). Frank III sought summary disposition under MCR 2.116(C)(10). Summary disposition under that subrule is appropriate, when viewing the evidence in a light most favorable to the nonmoving party, there is not a genuine issue of a material fact. *In re Miltenberger Estate*, 275 Mich App 47, 50; 737 NW2d 513 (2007). We review a trial court's decision on a motion to set aside an order or judgment[2] under MCR

_____

[1] We note that the document is undated and not notarized.

[2] A voluntary settlement reached by parties to resolve a legal action "[takes] the place of a court judgment, and . . . is tantamount to a judgment." *Farm Bureau Mut Ins Co of Mich v Buckallew*,

2.612(C)(1) for an abuse of discretion. *CD Barnes Assoc, Inc v Star Heaven, LLC*, 300 Mich App 389; 421-422; 834 NW2d 878 (2013). "The trial court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes." *In re Temple Marital Trust*, 278 Mich App 122, 128; 748 NW2d 265 (2008).

MCR 2.612(C) provides grounds for relief from an order or judgment:

(1) On motion and on just terms, the court may relieve a party or the legal representative of a party from a final judgment, order, or proceeding on the following grounds:

(a) Mistake, inadvertence, surprise, or excusable neglect.

(b) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under MCR 2.611(B).

(c) Fraud (intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

(d) The judgment is void.

(e) The judgment has been satisfied, released, or discharged; a prior judgment on which it is based has been reversed or otherwise vacated; or it is no longer equitable that the judgment should have prospective application.

(f) Any other reason justifying relief from the operation of the judgment.

### III. MUTUAL MISTAKE

Frank III argues that he is entitled to relief from the settlement under MCR 2.612(C)(1)(a) because the non-existence of a signed amendment was a mistaken belief on which he, the granddaughters, and the grantor's counsel all relied when they entered into the settlement. We agree with Frank III that the presumed non-existence of a signed amendment was material to the settlement negotiations. However, under the circumstances of this case, the probate court did not abuse its discretion in declining to set aside the settlement.

Public policy favors the finality of judgments. *Rose v Rose*, 289 Mich App 45, 58; 795 NW2d 611 (2010). "As a general rule, settlement agreements are final and cannot be modified." *Clark v Al-Amin*, 309 Mich App 387, 395; 872 NW2d 730 (2015) (quotation marks and citation omitted). Generally, settlements may only be set aside for fraud, mutual mistake, or duress. *Id*. A mutual mistake is "an erroneous belief, which is shared and relied on by both parties, about a

_____

471 Mich 940, 940; 690 NW2d 93 (2004). Thus, a party seeking relief from a settlement "must seek relief under the principles set forth in MCR 2.612."

material fact that affects the substance of the transaction." *Ford Motor Co v City of Woodhaven*, 475 Mich 425, 454; 716 NW2d 247 (2006).

Frank III argues that the probate court erred in not granting him summary disposition under a theory of mutual mistake. The probate court did not expressly find whether the existence of a signed amendment was a material fact. Instead, the court highlighted the other concerns regarding the amendment that, according to Ehrlich, influenced the parties' decision to settle. Implicit in the court's reasoning is that the existence of a signed amendment was immaterial to the settlement negotiations. We agree with the trial court that there were other concerns with the validation of the amendment that factored into the parties' decision to settle. It seems clear, however, that had Frank III known that there was a signed amendment in the grantor's desk, this would have affected the substance of the settlement negotiations. Therefore, we agree with Frank III that the existence of the signed document was a material fact.

However, we conclude that Frank III cannot rely on the doctrine of mutual mistake when he was aware of the *possibility* that a signed amendment existed. "A party bears the risk of a mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . . ." Restatement (Second) of Contracts, § 154, pp 402-403.[3] "Parties to a contract make a mutual mistake of fact . . . only if they are unconsciously ignorant or forgetful of a fact that existed prior to or at the time of settlement; ignorance of a future event does not amount to a mistake of fact." 15A CJS, Compromise & Settlement, § 67, p 154. These rules recognize the "risk allocation" involved in contract negotiations:

> Every time parties enter a contract, they act with incomplete information. They make judgment about the desirability of acquiring (and waiting for) additional information, and of creating specific contractual provisions to handle particular eventualities. Where they have been explicitly concerned about an issue, but decide to press forward without further inquiry or explicit provision, it is reasonable to suppose that they intend the contract to dispose of the risk in question, i.e., to bar any reopening at the behest of the party who, it turns out, would have done better without the contract. [*Harbor Ins Co v Stokes*, 310 US App DC 198; 45 F 3d 499, 502 (1995).[4]]

We find instructive *In re Estates of Thompson*, 226 Kan 437; 601 P2d 1105 (1979), which is strikingly similar to this case. In that estate case, a settlement was entered when the parties "were uncertain whether [a will] had been revoked, destroyed, lost or merely mislaid." *Id*. at 1109. After the settlement was approved, the will was found and the petitioner sought to

---

[3] A settlement agreement is construed as a contract, according to the legal principles that govern construction and interpretation of contracts. *In re Lett Estate*, 314 Mich App 587, 599; 887 NW2d 807 (2016).

[4] We may rely on federal and other states' caselaw for its persuasive value. *Churella v Pioneer State Mut Ins Co*, 258 Mich App 260, 268; 671 NW2d 125 (2003).

set aside the agreement. *Id.* at 1108. The Kansas Supreme Court determined that the settlement agreement should not be set aside on the ground of mutual mistake because, although the petitioner was aware that the will might be found later, he chose "to waive all inquiry into the matter . . . ." *Id*. at 1109. The court noted that the petitioner "undoubtedly believed that an original will would not be found or he would not have agreed to the settlement" but declined to grant him relief for his mistaken belief in that uncertainty. *Id*.

We find that *In re Estates of Thompson* and the rules set forth above are persuasive and applicable to this case. The parties agreed to settle all challenges to the validity of the amendment. This includes whether the amendment was ever signed and whether it still existed. The parties could have proceeded to an evidentiary hearing where these matters could have been explored and factual findings made. Instead, they decided to settle the disputed claims. See *Reicher v SET Enterprises, Inc*, 283 Mich App 657, 664; 770 NW2d 902 (2009) ("[B]y definition, a settlement agreement is a compromise of a disputed claim."). In doing so, the parties effectively agreed to drop all inquiry into whether a signed amendment existed. There is always the possibility that questions of fact or law will be answered after a settlement has been executed, and the would-be winning side may have buyer's remorse. Setting aside settlements under these circumstances would discourage settlements and the public policy favoring the finality of judgments.

Although we acknowledge that the doctrine of mutual mistake is available to set aside a settlement agreement, we also note that a settlement is significantly different than a contract for sale, the context in which the doctrine is more typically applied. For example, in *Sherwood v Walker*, 66 Mich 568; 33 NW 919 (1887), the parties contracted for the sale of a cow in the belief that the cow was not fertile. The cow was, in fact, pregnant. In that case, it was appropriate to rescind the contract on the ground of mutual mistake because the cow being sold was not what the parties believed it to be. In this case, there are no "goods" being transferred or sold. The only "exchange" is defined in the settlement, i.e., a 58/42 split of the trust residue, and that is exactly what the parties believed the settlement to be. The fact that later information meant that the terms of the settlement might have been different does not alter that the parties each knew what they were giving and getting in the settlement. In other words, upholding the settlement agreement does not defeat the parties' intent in entering into that agreement. See 17A CJS, Contracts, § 185, p 37 ("To warrant rescission of a contract, mutual mistake must frustrate the intent of the parties.").

Frank III argues that, by the time of the settlement, the parties believed that a signed amendment did not exist. However, we do not see how the parties, and specifically Frank III, could have been unaware of the possibility that the document might someday be found. Frank III entered into the settlement knowing that he had not searched for a signed amendment in the location where it was most likely to have been stored—and indeed eventually was later found—in the desk of the grantor's bedroom. Further, Ehrlich, the grantor's appointed counsel during the 2015 proceedings, had not searched the grantor's bedroom for the document. Ehrlich believed that the document should be presumed to have been destroyed. But he did not definitively believe that the document did not exist. The same is true of the granddaughters. It was their position that the amendment had not been signed and their position rested on the fact that a signed copy had not been located. This does not mean, however, that they entered into this settlement based on the belief that no signed copy had ever existed or would never be found. For

those reasons, Frank III bore the risk of mistake when he entered into the settlement that the signed document might be found.

In sum, the law's disposition to regard settlements as final, *Clark*, 309 Mich App at 395, militates against granting relief to Frank III under these circumstances. Accordingly, the probate court did not abuse its discretion by declining to grant relief from the settlement under MCR 2.612(C)(1)(a). Under the circumstances, enforcement of the agreement was a reasonable outcome. *In re Temple Marital Trust*, 278 Mich App at 128.

### III. NEWLY DISCOVERED EVIDENCE

We also disagree with Frank III's argument that he was entitled to relief from the settlement under MCR 2.612(C)(1)(b), which provides relief from a judgment based on "[n]ewly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under MCR 2.611(B)." To receive relief based on newly discovered evidence, a party must demonstrate that the evidence "(1) is newly discovered, (2) is not cumulative, (3) is likely to change the result, and (4) could not have been produced by the moving party using reasonable diligence." *South Macomb Disposal Auth v American Ins Co*, 243 Mich App 647, 655; 625 NW2d 40 (2000).

We agree that Frank III satisfied the first three elements.[5] However, the probate court did not err in finding that Frank III failed to exercise reasonable diligence to locate the signed Amendment. The document was in a drawer in the grantor's desk in the grantor's bedroom. This was an obvious starting point to search for legal documents. Frank III suggests that his filial deference to the privacy of the grantor's bedroom was a legitimate excuse for not finding the document, but Frank III's guardianship imposed on him legal responsibility for the grantor's "care, custody, and control . . . ." MCL 700.5314. Frank III's statutory responsibilities as the grantor's guardian necessarily took precedence over the grantor's privacy. Consequently, refusing to look inside the desk was not a reasonable choice.

Frank III argues that the probate court inconsistently found that Ehrlich, but not Frank III, exercised reasonable diligence in searching for a signed amendment. We disagree with Frank III's interpretation of the probate court's remarks. Viewed in context, the court's statement that Ehrlich demonstrated "the zeal to dig into this case" was a comment about Ehrlich's overall efforts on the grantor's behalf rather than a finding about Ehrlich's search efforts. We also reject Frank III's argument that the probate court's purported comparison of his and Ehrlich's efforts is analogous to an illogical verdict. Ehrlich and Frank III were not similarly situated with respect to their access to the grantor's papers. Frank III was the grantor's co-guardian from 2012 to 2015. Frank III did not need the other co-guardian's authorization to search for the grantor's

---

[5] We reject the granddaughters' contention that Frank III did not timely request relief under subrule (b). A motion for relief under subrule (C)(1)(b) must be made "within one year after the judgment, order, or proceeding was entered or taken." MCR 2.612(C)(2). The record discloses that Frank III raised the issue of newly discovered evidence in his April 2016 motion to vacate the October 2015 order ratifying and approving the settlement.

documents. In contrast, Ehrlich testified that the other co-guardian, the grantor's girlfriend, refused to allow him to search the grantor's desk, and Ehrlich's status as the grantor's attorney did not confer on him authority to override her control over her residence.

In sum, the probate court did not abuse its discretion by denying Frank III's motion for relief under MCR 2.612(C)(1)(b) because he failed to demonstrate that he exercised reasonable diligence in locating the document.

## IV. MCR 2.612(C)(1)(e) AND (f)

Finally, Frank III argues that the probate court erred by denying him relief from the settlement under MCR 2.612(C)(1)(e) and (f). We again disagree.

MCR 2.612(C)(1)(e) provides grounds for relief from a judgment where "it is no longer equitable that the judgment should have prospective application." Frank III argues that the 2015 order enforcing the settlement cannot be equitably enforced because doing so would thwart the grantor's express intent as stated in the signed amendment, only because Ehrlich was negligent in his duties. "The role of the probate court is to ascertain and give effect to the intent of the testator as derived from the language of the will." *In re Woodworth Trust*, 196 Mich App 326, 327; 492 NW2d 818 (1992). As discussed earlier, the granddaughters and Ehrlich raised concerns about the amendment's validity, which the parties voluntarily resolved through the settlement. Frank III's argument that the grantor's intent was thwarted by Ehrlich's alleged failure to diligently represent the grantor's interests is not supported by the record. Frank III's attacks on Ehrlich's diligence are unjustified because Frank III also failed to discover the signed amendment, despite having a greater right of access than Ehrlich to the grantor's bedroom where the signed document was found. Similarly, Frank III knew or should have known that the document might surface after the settlement.

Further, although the lack of a signed amendment was material to the settlement negotiations, there were other issues that were resolved by the settlement. Contrary to Frank III's contention that there were no issues involving the grantor's competency or undue influence in the 2015 proceedings, the granddaughters' motion to vacate alleged several suspicious circumstances surrounding the validation of the amendment in 2012, including (1) Johnston's misrepresentation that he was the grantor's attorney, (2) the grantor's debilitated state, (3) irregularities in Johnston's instructions regarding the grantor's signature, and (4) the lack of evidence of notarization. Moreover, the creation of the conservatorship and guardianship in 2012 was nearly contemporaneous with the validation of the amendment. The probate court apparently came to have concerns about whether the co-guardians and conservator were adequately representing the grantor's interests because the court removed the appointees from those positions in 2015.

Further, the parties filed briefs in anticipation of an evidentiary hearing, which was obviated by the settlement. Ehrlich's evidentiary hearing brief raised questions about Johnston's service of the petition on the grantor, who was blind and debilitated. At that time, Ehrlich argued that there were "a plethora of issues" that might or might not justify invalidation of the amendment, but which made "revisit[ation of] the Court's determination . . . reasonable and appropriate." By agreeing to settle, Frank III avoided further inquiry into these matters. We

presume that settlement was a calculated decision, and we fail to see how holding Frank III to the terms of that agreement can be construed as inequitable.

Next, MCR 2.612(C)(1)(f) provides ground for relief from judgment for "[a]ny other reason justifying relief from the operation of judgment." This provision applies only if the reason to set aside the judgment does not fall within any other provision of MCR 2.612(C)(1). *Rose*, 289 Mich App at 54. This Court applies a "three-part test for ascertaining whether the 'extraordinary relief' envisioned in the predecessor [GCR 1963, 528.3(6)] of MCR 2.612(C)(1)(f) is warranted." *Id.* The three requirements of this test are:

> (I) [T]he reason for setting aside the judgment must not fall under subrules (1) through (5) [now subrules (a) through (e)], (II) the substantial rights of the opposing party must not be detrimentally affected if the [judgment] is set aside, and (III) extraordinary circumstances must exist which mandate setting aside the judgment in order to achieve justice. [*Id.*, quoting *Lark v Detroit Edison Co*, 99 Mich App 280, 284; 297 NW2d 653 (1980).]

Additionally, "relief is to be granted only where the judgment was obtained by the improper conduct of the party in whose favor it was rendered." *Rose*, 289 Mich App at 54, quoting *McNeil v Caro Community Hosp*, 167 Mich App 492, 497; 423 NW2d 241 (1988).

Frank III fails to satisfy these requirements. The signed amendment did not warrant setting aside the settlement on grounds of mutual mistake or newly discovered evidence, and Frank III fails to demonstrate any other reason why it should. Frank III denies that setting aside the settlement would detrimentally affect the granddaughters' rights because they have not yet received funds from the trust. However, the granddaughters would be required to renew their objections to the amendment despite having previously resolved the trust dispute through voluntary settlement. And "[e]xtraordinary circumstances" do not exist where Frank III entered into the settlement without determining whether the grantor placed the signed amendment in his desk. Finally, the granddaughters did not obtain the settlement through any improper conduct. Although the probate court did not make specific statements regarding MCR 2.612(C)(1)(e) and (f), Frank III's arguments concerning these subrules overlapped substantially with his arguments pertaining to mutual mistake and newly discovered evidence. Having rejected those arguments, the probate court did not err by also denying relief under subrules (C)(1)(e) and (f).

Affirmed. As the prevailing party, the granddaughters may tax costs. MCR 7.219(A).

/s/ Jonathan Tukel
/s/ Jane M. Beckering
/s/ Douglas B. Shapiro