*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JACK A. CLARK and DIXIE L. CLARK,

        Plaintiffs/Counterdefendants-
        Appellants/Cross-Appellees,

v

EUNICE M. POHL, ROBERT HUNT, JILL HUNT,
LEONARD W. WANNEMACHER, DONALD L.
WANNEMACHER, TERRY P. WANNEMACHER,
THOMAS J. WANNEMACHER, TODD A.
WANNEMACHER, BLAINE MARTIN, DALE
MARTIN, JAYLENE WURST-RYAN, NANETTE
WURST-WEAVER, CHERYL HERSHEY, JIM
KLIMA, MARY JO MAAG, ROBERT E. KLIMA
and SAUNDRA J. KLIMA, trustees of the ROBERT
E. KLIMA & SAUNDRA J. KLIMA REVOCABLE
LIVING TRUST, LOUIS W. WILCOX, and TIM
WILCOX,

        Defendants-Appellees,

and

COTTONWOOD RESORT, also known as
COTTON WOOD RESORT,

        Defendant/Counterplaintiff-
        Appellee/Cross-Appellant.

UNPUBLISHED
October 15, 2025
2:22 PM

No. 366717
Branch Circuit Court
LC No. 2019-060295-CH

Before: GARRETT, P.J., and RICK and MARIANI, JJ.

PER CURIAM.

        In this property dispute, plaintiffs/counterdefendants, Jack A. Clark and Dixie L. Clark, appeal by right the trial court's judgment following a bench trial. On appeal, the Clarks argue that

-1-

the trial court erred by concluding that defendant/counterplaintiff, Cottonwood Resort, also known as Cotton Wood Resort, established a prescriptive easement to place a dock on a portion of land owned by the Clarks. The Clarks further argue that the court erred by recognizing the easement because Cottonwood only sought such an easement to cure its failure to conduct reasonable diligence while purchasing the adjoining property. The Clarks also contend that Cottonwood has abandoned the property. And, in a cross-appeal, Cottonwood argues that it adversely possessed the disputed property, which provided it with the associated riparian rights.[1]

In addition, the Clarks assert claims concerning a stipulated judgment and accompanying settlement agreement that the Clarks entered into with defendants-appellees Leonard Wannemacher,[2] Donald L. Wannemacher, Terry P. Wannemacher, Thomas J. Wannemacher, Todd A. Wannemacher, Blaine Martine, Dale Martin, Jaylene Wurst-Ryan, Nanette Wurst-Weaver, Cheryl Hershey, Jim Klima, Mary Jo Maag, Robert E. Klima and Saundra J Klima, as trustees of the Robert E. Klima & Saundra J. Klima Revocable Living Trust, Louis W. Wilcox, and Tim Wilcox[3]—who are collectively identified by the parties as the "Lot 10 defendants"—concerning the ownership of an island. On appeal, the Clarks assert that the trial court erred by declining their request to reform the judgment and agreement to effectuate the intent of the agreement, which was for the Clarks to own the entire island. The Clarks believe that, at a minimum, the trial court should have held an evidentiary hearing on the matter.

For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

This appeal concerns a dispute over property on and by Marble Lake in Quincy, Michigan. At the time of the proceedings below, the Clarks owned property at 906 Wildwood Beach Road (the 906 property). The 906 property ran east and west and was next to Wildwood Beach Road. The Clarks also owned another parcel that ran north and south between the 906 property and Marble Lake. As a result, the two parcels formed an "L" shape. The parties refer to the north and south parcel as the "L-shaped" parcel. The 906 property had the Clarks' cottage on it. The L-shaped parcel consisted mostly of an island, a channel, and a small, triangle-shaped portion of land in the northeast corner that the parties refer to as "the Point."

---

[1] Our Supreme Court has noted that, "strictly speaking, land which includes or abuts a river is defined as riparian, while land which includes or abuts a lake is defined as littoral. However, the term 'riparian' is often used to describe both types of land[.]" *2000 Baum Family Trust v Babel*, 488 Mich 136, 138 n 1; 793 NW2d 633 (2010) (quotation marks, citations, and alteration omitted). We will do the same in this opinion.

[2] In their appellate briefing, defendants clarify that this individual is misidentified in the caption as Leonard W. Wannemacher and his name is instead Leonard L. Wannemacher.

[3] Defendant Eunice M. Pohl was dismissed as a defendant by stipulation of the parties. There was a default judgment entered against defendants Jill Hunt and Robert Hunt. Neither Pohl nor the Hunts are active parties in this appeal.

Cottonwood owned 908 Wildwood Beach Road (the 908 property), which was located directly north of the 906 property and east of the L-shaped property. North of the 908 property was a public access area to Marble Lake. There was a fence separating the 906 property and the 908 property.

The lot located directly south of the 906 property was owned by the Clarks' daughter and son-in-law, Robert and Jill Hunt. The property referred to as Lot 10 was directly south of the Hunts' property.

There were several owners of the 908 property while the Clarks owned the 906 property. Although the testimony at trial was inconsistent, it appears that most of the owners of the 908 property installed a dock in the channel almost every year. The length of the dock varied, but testimony at trial indicated that the dock was typically between 90 and 100 feet. In 2017, Kari and Kurt Barve purchased the 908 property. They owned a nearby campground called the Cottonwood Resort. Apparently, the Barves purchased the 908 property with the intent to expand their business. In 2018, the Barves put in the dock at the 908 property that had been left by the previous owner, Leora Bull. The Clarks did not object to the dock in 2018. However, the Clarks alleged that the Barves extended the dock in 2019, and there were several pontoon boats attached to the dock. A local business started renting boats from the dock. Boaters affiliated with Cottonwood then started trespassing on the island, dock, and the bridge owned by the Clarks.

The Clarks hired surveyor David Mostrom to complete a survey. The survey showed that the L-shaped parcel extended into the area between the 908 property and Marble Lake. As a result, Cottonwood's dock extended onto land owned by the Clarks. The Clarks thereafter filed the instant lawsuit for quiet title and permanent injunction against Cottonwood and eventually the Lot 10 defendants concerning ownership and use of both the L-shaped parcel and the island. Cottonwood filed a countercomplaint, arguing that Cottonwood obtained riparian rights to Marble Lake by adverse possession or acquiescence. The litigation unfolded such that the Clarks' dispute with the Lot 10 defendants was resolved before their dispute with Cottonwood was.

The dispute concerning the Lot 10 defendants involves the ownership and riparian rights associated with the island separating the channel from the lake that is in front of the 906 property, the 908 property, the property owned by the Hunts, and Lot 10. The Clarks contended that they obtained ownership of the entire island by adverse possession, while the Lot 10 defendants maintained that they owned the portion of the island across the channel from Lot 10. The Clarks participated in mediation with the Lot 10 defendants. The parties ultimately signed a settlement agreement, and the trial court thereafter entered a stipulated order of dismissal with prejudice in light of the settlement agreement. The settlement agreement contained, among other things, the following provision:

> B. QUITCLAIM DEED: Lot 10 Defendants agree to execute and deliver a Quitclaim Deed to Plaintiffs . . . conveying the parcel of property identified and described as the "Island" in the Mostrom Survey. The Quitclaim Deed shall be delivered to Plaintiffs not later than 14 days following the signing of this Settlement Agreement and all costs associated with the recording of said deed shall be borne by Plaintiffs.

The description of the island in the referenced Mostrom Survey,[4] however, did not include the entire existing island; instead, it included only the portion already owned by the Clarks and Hunts. The Clarks petitioned to reform the stipulated judgment pursuant to MCR 2.612(C)(1)(a), claiming that there had been a mistake of fact regarding what the Mostrom Survey included and that the intent of the agreement was to convey the entirety of the island to them. According to the Clarks, the Lot 10 defendants learned of this mistake following the entry of the settlement and judgment, took possession of the portion of the island that they claimed they still owned, erected a fence, and took various actions to harass the Clarks in connection with the island. The Lot 10 defendants responded, urging the court to deny the petition and to award them attorney fees under the terms of the settlement agreement for having to defend the agreement. The Lot 10 defendants denied the Clarks' claim of mistake, stressed that the agreement spoke clearly for itself, and took issue with other representations in the petition. After holding a hearing, the trial court denied the Clarks' petition, dismissed it with prejudice, and granted the Lot 10 defendants' request for attorney fees.

The dispute concerning Cottonwood and the ownership of the portion of the L-shaped parcel that is front of the 908 property was thereafter addressed at a bench trial. In a written opinion, the trial court determined that the Clarks' property was the lakefront property with riparian rights, while the 908 property did not have riparian rights because the channel next to the property was manmade. The court, however, concluded that the 908 property had a prescriptive easement for a 90-foot dock that could be placed on the north one-third of the property. Cottonwood would be permitted to utilize the dock for personal purposes only, which included the ability to have up to four motorized water vessels attached to the dock. Cottonwood would also

---

[4] The Survey described the island as follows:

> ISLAND
>
> A PARCEL OF LAND LYING WEST OF THE CHANNEL, WHICH RUNS IN FRONT OF THE TWO COTTAGE LOTS NOW OWNED BY STETLER, AND DESCRIBED AS: BEGINNING AT A POINT ON THE NORTH LINE OF SECTION 33 IN TOWN 6 SOUTH OF RANGE 5 WEST, IN THE CENTER OF THE ROAD (SAID POINT BEING DESIGNATED AS POINT "E" IN A SURVEY MADE BY E. L. MINER IN 1923, AND RECORDED IN LIBER 4, PAGE 101, COUNTY SURVEYOR'S RECORDS, AND LATER RE-ESTABLISHED BY TERRILL IN 1939), THENCE RUNNING WEST 190 FEET ALONG THE SECTION LINE AS A PLACE OF BEGINNING OF THE PREMISES HEREIN CONVEYED, THENCE DUE SOUTH 116.23 FEET, THENCE DUE WEST 48.1 FEET, THENCE IN A NORTHERLY DIRECTION ALONG THE LAKE SHORE 117.1 FEET TO POINT "D" AS SHOWN ON THE SURVEY ABOVE REFERRED TO, THENCE WEST 48.1 FEET TO THE PLACE OF BEGINNING.
>
> COMMONLY KNOWN AS 873 WILDWOOD BEACH ROAD, QUINCY, MICHIGAN.

have an easement to the effect of all previous owners for swimming, wading, and fishing. The trial court likewise determined that the Clarks had established a prescriptive easement for hand digging and maintaining the channel. Cottonwood moved for reconsideration, which the trial court denied.

This appeal and cross-appeal followed.

## II. DISPUTE WITH COTTONWOOD

We start with the dispute between the Clarks and Cottonwood, which was, as noted, resolved through a bench trial. We find, in the parties' arguments on appeal and cross-appeal, no error warranting reversal.

### A. STANDARD OF REVIEW

"A trial court's factual findings in a bench trial are reviewed for clear error." *Astemborski v Manetta*, 341 Mich App 190, 195; 988 NW2d 857 (2022) (quotation marks and citation omitted). "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made. This Court is especially deferential to the trial court's superior ability to judge of the relative credibility of witnesses." *Id*. at 195 (quotation marks, citation, and alteration omitted). "We review a trial court's conclusions of law in a bench trial de novo." *Id*. at 196.

### B. PRESCRIPTIVE EASEMENT

First, we address the Clarks' argument that that the trial court erred by concluding that Cottonwood established a prescriptive easement to install a dock in front of the 908 property. We disagree.

This appeal concerns the riparian rights of owners of lakefront property. "It is well established that a riparian owner enjoys certain exclusive rights, which include the right to erect and maintain docks along the owner's shore, and the right to anchor boats permanently off the owner's shore." *Id*. (quotation marks and citation omitted). "A nonriparian owner, on the other hand, has a right to use the surface of the water in a reasonable manner for such activities as boating, fishing, and swimming, as well as the right to anchor boats temporarily." *Id*. (quotation marks and citation omitted). "[A] riparian owner may grant nonriparian owners the right to access and enjoy a lake by easement or license." *Id*. (quotation marks and citation omitted).

"An easement is a limited property interest; it is the right to use the land burdened by the easement for a specific purpose." *Id*. (quotation marks and citation omitted). Easements may be created by various means, such as by a grant, agreement, or prescription. *Id*. "An easement by prescription is based upon the legal fiction of a lost grant, and results from action or inaction leading to a presumption that the true owner of the land, by his acquiescence, has granted the interest adversely held." *Id*. at 197 (quotation marks and citation omitted). "An easement by prescription results from use of another's property that is open, notorious, adverse, and continuous for a period of fifteen years." *Id*. at 197-198 (quotation marks and citation omitted). Accordingly,

"a prescriptive easement is no more than an unopposed, continuous trespass on another's property for 15 years." *Id*. at 198 (quotation marks, citation, and alteration omitted).

A party "claiming entitlement to a prescriptive easement must do so by clear and cogent evidence." *Id*. at 199 (quotation marks and citation omitted).

> Clear and cogent evidence is more than a preponderance of evidence, approaching the level of proof beyond a reasonable doubt. That is to say, the standard is much like clear and convincing evidence. Thus, in an adverse possession case, for a party to establish possession by clear and cogent evidence, the evidence must clearly establish the fact of possession and there must be little doubt left in the mind of the trier of fact as to the proper resolution of the issue. Thus, where there is any reasonable dispute, in light of the evidence, over the question of possession, the party has failed to meet his burden of proof. [*Id*. (quotation marks, citation, alteration, and ellipsis omitted).]

In this case, the Clarks argue that the trial court erred by concluding that Cottonwood established the adversity element of a prescriptive easement claim for the necessary period of 15 years because Dixie Clark testified that Norman Bidwell—who owned the 908 property from 1992 until 2009—placed his dock with Jack Clark's permission.

The "use of another's property qualifies as adverse when made under a claim of right when no right exists." *Id*. (quotation marks, citation, and alteration omitted). The use is adverse if it is a use "inconsistent with the right of the owner, without permission asked or given, which would entitle the owner to bring an action for trespass or nuisance." *Id*. (quotation marks and citation omitted). As a result, permissive use of another's property will defeat a prescriptive easement claim. *Id*. at 200.

"If no single period of adverse use amounts to the 15-year statutory period, a party claiming a prescriptive interest may tack the possessory periods of their predecessors in interest to aggregate the 15-year period of prescription if the claimant can show privity of estate." *Marlette Auto Wash LLC v Van Dyke SC Props LLC*, 501 Mich 192, 203; 912 NW2d 161 (2018) (quotation marks and citation omitted). Our Supreme Court explained that there are limited circumstances under which privity of estate may be established. *Id*. First, privity is established "when the deed includes a description of the disputed property." *Id*. "The second circumstance occurs when there is an actual transfer or conveyance of the disputed property by parol statements made at the time of conveyance." *Id*. Finally, "a parol transfer may occur if a property owner is 'well-acquainted' with the previous property owner and had visited and used the disputed property 'for many years' before acquiring title." *Id*. "Under those circumstances, the parties must have understood that an easement was appurtenant to the land." *Id*. (quotation marks, citation, and alteration omitted).

In addition, "a claimant seeking to prove the existence of a prescriptive easement may establish that the requisite elements were met by the claimant's predecessor in interest." *Id*. "When a prescriptive easement vests with the claimant's predecessors in interest, the easement is appurtenant and transfers to subsequent owners in the property's chain of title without the need for the subsequent owner to establish privity of estate." *Id*. at 203-204.

The testimony provided at the bench trial in this case showed that the owners of the 908 property—starting with Dale Richhart in 1987—placed a 90- to 100-foot dock in the water in front of the property. The dock extended onto the L-shaped parcel owned by the Clarks. Richhart testified that he did not seek or receive permission to install the dock. He did not recall ever having a disagreement with Jack concerning the placement of the dock. He left the dock with the property when he sold it in 1992. This dock was then used by the Norman and Patricia Bidwell, who owned the property from 1992 until 2009; Leora Bull, who owned the property from 2009 until 2017 and who extended the dock to 100 feet; and then finally, Cottonwood. Bull testified that she started visiting the property in 1991[5] and that there was always a 90-foot dock in front of the property. Both Bull and Kari Barve testified that they did not seek permission to install the dock in front of the cottage on the 908 property because they were both under the impression that they owned the land and such permission was not necessary. Norman and Patricia were deceased by the time that the bench trial was held; however, their son Richard Bidwell testified that he put in the dock for his parents every year. He was not aware that the Clarks owned the bottomland in front of the 908 property. He did not believe that Norman would have purchased the 908 property if he knew that the land did not extend to the water.

The Clarks refer to Dixie's testimony that Jack gave Norman Bidwell permission to install the dock in front of the cottage on the 908 property as support for the claim that the use of the L-shaped parcel to install a dock was permissive. But Dixie's testimony was contradicted by various previous owners and the current owner of the 908 property, who all testified that no permission was sought or received. Moreover, Dixie did not provide any details concerning this alleged oral agreement between Jack and Norman, such as whether there were any restrictions as to the length or placement of the dock. Likewise, Richhart contradicted Dixie's testimony that Jack told Richhart to remove his dock, while Richard Bidwell and Bull testified that there was never any objection concerning the dock from the Clarks.

Considering the testimony that was provided at trial and "the trial court's superior ability to judge of the relative credibility of witnesses," the trial court did not clearly err by finding that permission had not been given to the owners of the 908 property to install a dock on the bottomland owned by the Clarks. *Astemborski*, 341 Mich App at 195-196 (quotation marks and citation omitted). Accordingly, and because owners of the 908 property—including Norman and Patricia Bidwell, who owned the property for a period of 17 years—had been continuously placing a 90- to 100-foot dock on the disputed property every summer since 1987, the trial court did not err by concluding that Cottonwood had established a prescriptive easement to place a dock that extends onto the L-shaped parcel. See *id*.

## C. EQUITY

The Clarks further argue that principles of equity should bar the establishment of a prescriptive easement because Cottonwood failed to exercise due diligence before purchasing the

---

[5] Although Bull testified that she started visiting the property in 1991, Norman and Patricia did not purchase the 908 property until 1992. It is unclear whether Bull's testimony was mistaken or she started visiting the property before Norman and Patricia officially owned the property.

908 property. Because the Clarks failed to raise this argument in the trial court, it is not preserved, and we decline to consider it. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289; 14 NW3d 472 (2023) (explaining that "Michigan follows the 'raise or waive' rule of appellate review" and that "[i]f a litigant does not raise an issue in the trial court, this Court has no obligation to consider the issue") (quotation marks and citation omitted).

## D. ABANDONMENT

Finally, the Clarks assert that Cottonwood has effectively abandoned the 908 property and that the Clarks should be deemed to have reentered. We disagree.

"To prove abandonment, both an intent to relinquish the property and external acts putting that intention into effect must be shown." *Ludington & N Ry v Epworth Assembly*, 188 Mich App 25, 33; 468 NW2d 884 (1991). "Nonuse, by itself, is insufficient to show abandonment." *Id*. "Rather, nonuse must be accompanied by some act showing a clear intent to abandon." *Id*.

In this case, although there was some testimony indicating that no one was living or using the cottage on the 908 property, the ownership of the cottage was not in dispute. In addition, the ownership of the island was not in dispute as to the Clarks and Cottowood—Cottonwood did not assert any claim to the island. Instead, the dispute concerned the ownership and use of the water in front of the 908 property. Kari Barve testified that she and Kurt stopped putting in the dock after this lawsuit was filed. She wanted the case to be resolved before continuing to use the property.

As a result, although Cottonwood declined to use the property during the pendency of this lawsuit, there is no evidence of a clear intent to abandon the property. See *id*. To the contrary, Cottonwood vigorously defended the quiet title action and even counterclaimed, asserting ownership of the disputed property through adverse possession. Therefore, the Clarks have not shown that Cottonwood abandoned the disputed property to the extent that it would affect the prescriptive easement. See *id*.

## E. ADVERSE POSSESSION

Next, we consider Cottonwood's argument on cross-appeal that the trial court erred by concluding that it failed to establish ownership of the disputed property by adverse possession. We conclude that the trial court did not err by determining that Cottonwood failed to prove all of the elements of adverse possession—specifically, the element of exclusivity.

The relevant statute, MCL 600.5801, provides:

No person may bring or maintain any action for the recovery or possession of any lands or make any entry upon any lands unless, after the claim or right to make the entry first accrued to himself or to someone through whom he claims, he commences the action or makes the entry within the periods of time prescribed by this section.

"A party claiming adverse possession must show clear and cogent proof of possession that is actual, continuous, open, notorious, exclusive, hostile, and uninterrupted for the relevant statutory period." *Marlette Auto Wash*, 501 Mich at 202. In Michigan, the statutory period is 15 years. *Id*. at 201; see also MCL 600.5801(4). "When the elements of adverse possession have been met, the law presumes that the true owner, by his acquiescence, has granted the land, or interest to the land, so held adversely." *Marlette Auto Wash*, 501 Mich at 202 (quotation marks and citations omitted).

At the outset, the parties dispute the burden of proof for establishing adverse possession and prescriptive easement. The burden of proof is the same for both doctrines—clear and cogent evidence. *Id*.; *Astemborski*, 341 Mich App at 199. Adverse possession and prescriptive easement require similar elements; however, adverse possession requires exclusivity, while a prescriptive easement does not. *Matthews v Dep't of Natural Resources*, 288 Mich App 23, 37; 792 NW2d 40 (2010). The trial court concluded that Cottonwood failed to establish the exclusivity element of its adverse possession claim. To demonstrate exclusive possession, the adverse possessor must openly exercise acts of ownership, "with the intention of holding the property as his own to the exclusion of all others." *Smith v Feneley*, 240 Mich 439, 442; 215 NW2d 353 (1927).

The trial court did not err by concluding that Cottonwood failed to establish that it openly exercised ownership of the L-shaped parcel to the exclusion of all others. There was testimony at trial that the owners of the 906 property and the owners of the 908 property mainly used the water in front of their respective cottages. In addition, there was testimony that Kari and Kurt Barve asked that boats that they believed were on Cottonwood's property be moved. However, Dixie Clark, Jill Hunt, and Jacquelyn Perkey (another one of the Clarks' daughters) all testified that they knew that the bottomland in front of the 908 property—including the Point—belonged to the Clarks. Richard Bidwell testified that occupants of the properties swam in front of the cottages without much consideration to property lines. The Clarks used the channel to travel from the shore to the lake and to maintain the island. Moreover, the Clarks continuously maintained the channel by dredging and removing debris. There was no testimony provided at trial indicating that any of the previous owners of the 908 property attempted to stop any maintenance of the channel in front of the property. Indeed, Leora Bull testified that she asked for permission from the Clarks before her foster children helped clean the channel. Further, although Bull testified that she and Norman Bidwell did some upkeep at the Point, there was no evidence that any of the 908 property owners attempted to stop the Clarks from accessing or maintaining the Point.

In sum, the testimony at trial does adequately not support the contention that owners of the 908 property held out the property at issue as their own to the exclusion of all others, and we see no clear error in the trial court's conclusion to that effect. See *id*.; *Astemborski*, 341 Mich App at 195-196. Accordingly, and as the trial court correctly recognized, Cottonwood's adverse-possession claim fails. See *Matthews*, 288 Mich App at 37.

## III. DISPUTE WITH THE LOT 10 DEFENDANTS

Finally, we turn to the dispute between the Clarks and the Lot 10 defendants, regarding ownership over the southerly portion of the island that lies across the channel from Lot 10. The Clarks argue that the trial court erred by dismissing their petition to reform the stipulated judgment and accompanying settlement agreement with the Lot 10 defendants. According to the Clarks, the intent of the agreement was to establish the Clarks' ownership over the entire island, including the

portion across the channel from Lot 10; the agreement's use of the Mostrom Survey to do so was based on a mistake of fact regarding the Survey; and the court should have, at minimum, held an evidentiary hearing on the matter before ruling. Given the limited record now before us, we must reverse and remand for further proceedings.

As noted, the Clarks petitioned to reform the stipulated judgment under MCR 2.612(C)(1)(a), which permits relief from judgment on the basis of "[m]istake, inadvertence, surprise, or excusable neglect." "We review a trial court's decision to grant or deny a motion for relief from judgment for an abuse of discretion, which occurs when the trial court's decision falls outside the range of principled outcomes" or when the court "premises its exercise of discretion on an error of law." *Int'l Outdoor, Inc v SS Mitx, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 359082); slip op at 3-4.

Our ability to meaningfully review the trial court's decision on the Clarks' petition is significantly impaired by the fact that the court provided no explanation for its decision. It held a hearing on the Clarks' petition, at which it received oral argument from the parties and took the matter under advisement; it informed the parties at that time that it planned to determine whether it could decide the matter on the information then before it or if it instead would require further briefing and/or evidence. A few days later, the court entered a short and conclusory order denying the petition, dismissing it with prejudice, and awarding the Lot 10 defendants attorney fees under the settlement agreement. The court's order offered no reasoning or insight into the legal or factual basis of its decision—which, in turn, has left this Court ill equipped to evaluate whether the trial court made an error or law or otherwise abused its discretion in reaching that decision. See *id*. On the record now before us, however, it appears the court may well have.

To start, the terms of the settlement agreement, on their face, appear to provide substantial support for the Clarks' position that the intent of the agreement was to convey ownership of the entire island to the Clarks, rather than leaving the Lot 10 defendants with the portion of the island across from Lot 10. Take, for instance, the quitclaim deed contemplated by the agreement and ultimately executed by the Lot 10 defendants. As noted, Paragraph 2B of the agreement states that the Lot 10 defendants agreed to convey the parcel of property identified as the island in the Mostrom Survey—which, as no one now disputes, did not include the portion of the island across from Lot 10. This, however, would be an odd transaction, whose rhyme or reason (if any) the present record wholly fails to address: the Lot 10 defendants would be purporting to convey property that they did not own (or even seemingly claim to own) to the Clarks, with the Clarks in turn receiving from the Lot 10 defendants only what the Clarks already owned. If the intent of the agreement was truly not to convey to the Clarks the southerly portion of the island across from Lot 10, then there would be, based on the record now before us, no apparent reason for this provision in the agreement or for the execution of the quitclaim deed.

Other provisions of the settlement agreement are also in accord with the Clarks' claim of mistake. For instance, Paragraph 2C, which pertains to "Island Maintenance," provides that the Clarks "are permitted to maintain the boundary of the Island" but that "[a]ll maintenance of the southern portion of the Island shall be completed from an upland position on the Island, except for [sic] [the Clarks] shall be permitted to enter upon the bottomland of Lot 10, once a year in the spring, only to the extend [sic] absolutely necessary, in order to retrieve and replace the rocks specifically displaced from the southern portion of the Island due to winter ice." This provision

-10-

makes good enough sense if the agreement is understood to convey the southerly portion of the island across from Lot 10 to the Clarks, in that it sets limits on how the Clarks may interact with that newly acquired portion of the island relative to the rights and interests that the Lot 10 defendants retained with respect to the bottomland of the channel alongside it. As the Clarks pointed out below, however, if the intent of the agreement was not to convey that portion of the island to the Clarks, it is seemingly far less clear what reason there would be for the agreement to state that the Clarks are permitted to maintain the boundary of the property they already owned, or to set terms on how the Clarks could maintain a portion of the island that was not becoming theirs but remaining the Lot 10 defendants' (let alone why the Clarks might be interested in undertaking such maintenance in the first place).

Similarly, there is Paragraph 2D, titled "No Island Expansion," which provides that "[t]he Island shall not be enlarged or expanded by [the Clarks] in a Southerly direction to otherwise interfere or encroach on the bottomland of Lot 10 and the respective riparian rights of Lot 10 Defendants"—a provision whose purpose and practical effect are readily apparent if the Clarks are understood to have received ownership of that southerly portion of the island bordering the portion of the channel within Lot 10. Paragraph 2G, which addresses the Clarks' and Lot 10 defendants' respective rights and obligations as to the channel, is titled "Riparian Rights of Plaintiffs"—a title consistent with an understanding that the Clarks obtained such rights with respect to the portion of the island that borders the Lot 10 portion of the channel. And Paragraph 2H, titled "Preservation of the Shoreline," provides that the Clarks and Lot 10 defendants "may take all reasonable measures to protect and preserve the natural shoreline of their respective properties"—another provision whose purpose and effect become much clearer if the agreement is understood to convey the shoreline property of the island across from Lot 10 to the Clarks (with the Lot 10 defendants otherwise retaining the beachside shoreline property within Lot 10).[6]

---

[6] In their response to the Clarks' petition, the Lot 10 defendants emphasized Paragraph 2E of the agreement, which is titled "Acknowledgement of Boundary and Riparian Rights of Lot 10" and provides that the Clarks

> identify and acquiesce to the Northern boundary line of Lot 10 of the Wildwood Beach . . . and its extension in a Westerly direction into Marble Lake as the defined Northern Boundary of Lot 10 Defendants' riparian rights and further acknowledge Lot 10 Defendants' riparian rights to all area lying between the Northern Boundary and the parallel Southern boundary line of Lot 10 extended in a Westerly direction into Marble Lake.

This provision makes clear that the Lot 10 defendants retain riparian rights to the beachside shoreline of Lot 10 and then the portion of the channel and lake west of it. It seemingly falls short, however, of stating that the Lot 10 defendants retain ownership of the portion of the island itself that lies across from Lot 10—or, at the very least, any such reading of the provision would require reconciliation with the numerous other provisions of the agreement discussed above that indicate otherwise.

-11-

Accordingly, the plain terms of the settlement agreement, which the stipulated judgment incorporated by reference, appear to support the conclusion that the intent of the agreement was to convey the entire island to the Clarks, and that the use of the Mostrom Survey as a reference point for doing so was a mistake.[7] To the extent the trial court concluded otherwise, it has left us no record as to why it might have done so.

Moving beyond the agreement itself, the Lot 10 defendants stressed to the trial court that the Clarks were the ones to commission the Mostrom Survey in the first place and even relied on it in their complaint in the instant lawsuit. But we fail to see, on the record now before us, how these points demonstrate the absence of the claimed mistake. That the Clarks commissioned the Survey does not, in itself, mean that they correctly understood it at the time they signed the agreement. Nor is that shown by the Clarks' reliance on the Survey in their complaint. In seeking to "quiet title in the 'island,' " the complaint alleges that the Clarks' grandparents had "carved out the channel, creating the island in Exhibit #6, (The Mostrom Survey), which is described in that survey"; that "[t]he majority of the island lies within the confines of the description being currently owned by" the Clarks; and that the Clarks "have exercised sole ownership and dominion over the property described as the island," including by "pa[ying] taxes on the property, as the majority of it is within the confines of their description shown on the Moestrom [sic] survey." Taken together, these allegations suggest that the Clarks viewed the Mostrom Survey as comprising the entire "island" to which they were seeking to quiet title—or, at the very least, the allegations reflect some confusion by the Clarks to that effect. They do not, in our view, evidence the absence of mistake in relying on the Survey for purposes of the settlement agreement and stipulated judgment.

The Lot 10 defendants also argued to the trial court that, as a matter of law, the Clarks could not seek relief for any mistake they may have made regarding the Mostrom Survey because, under *Farm Bureau Ins Co of Mich v Buckallew*, 471 Mich 940 (2004), that mistake would have been nothing more than the product of the Clarks' own carelessness or lack of due diligence. It might be that the trial court agreed with this legal argument, and premised its dismissal of the Clarks' petition upon it; the record provides us no way of knowing if that is the case and, if so, why. We do not, however, find the present record sufficient to support such a conclusion.

In *Buckallew*, the parties agreed to the settlement of a personal injury lawsuit for $300,000. The settlement resulted in dismissal of the suit. *Id*. at 940. Both parties mistakenly believed the settlement amount represented the policy limits of the tort defendant's liability insurance with Farm Bureau, when in fact the policy limits were $200,000. *Id*. When the mistake was discovered, Farm Bureau sought to rescind or reform the agreement. *Id*. Our Supreme Court concluded that relief was not warranted, explaining that Farm Bureau's "mistake in understanding its own policy is not a mistake or excusable neglect that can be a basis for relief under MCR 2.612(C)(1)(a).

---

[7] The Lot 10 defendants stress that the agreement is unambiguous in its incorporation of the Mostrom Survey, but we fail to see how that proposition in itself answers whether there was a relief-worthy mistake in such incorporation—and, as detailed above, many terms of the agreement seemingly belie the Lot 10 defendants' position and indicate that there was such a mistake.

[Farm Bureau] had access to all the necessary information, and its error is not excused by its own carelessness or lack of due diligence." *Id.*

*Buckallew* thus reflects that a party's "own carelessness or lack of due diligence" with respect to a mistake may foreclose that party from securing relief under MCR 2.116(C)(1)(a). *Id.* We do not read *Buckallew* to hold, however, that such relief is foreclosed anytime any form or measure of carelessness or lack of due diligence might be fairly ascribed to the moving party; indeed, if that were the intent of MCR 2.116(C)(1)(a), it is difficult to see why the rule would have allowed for the notion of "neglect" that would be "excusable." Rather, we read *Buckallew* to illustrate one circumstance in which the moving party's carelessness or lack of due diligence was significant enough to defeat its bid for relief. Whether this case presents such a circumstance as well is, in our view, far from clear at this point. This is not, for instance, a matter of an insurer simply misreading the plain terms of the policy that it itself had full control over, and expertise in, drafting. Nor is a matter of that insurer, as a result of such a mistake, merely agreeing to pay more than its policy's limits to settle a claim. Instead, it is an apparent mistake in understanding exactly how a survey's technical description of certain property actually layered onto the physical property—a mistake which the Clarks maintain (and, as discussed, the agreement's terms seemingly support) wholly frustrated the agreement's core purpose and benefit for them: securing their ownership of the entire island. It may be that, upon further development, the circumstances in this case are shown to, like those in *Buckallew*, fall outside the relief authorized by MCR 2.116(C)(1)(a).[8] But with what little we have now before us, we cannot affirm any such conclusion the trial court might have reached.[9]

---

[8] On appeal, the Lot 10 defendants also cite *Clark v Al-Amin*, 309 Mich App 387; 872 NW2d 730 (2015). We note, however, that *Clark* did not purport to analyze a motion for relief from judgment under MCR 2.612, which, as *Buckallew* made clear, provides the governing analytical framework for cases such as this one. See *Buckallew*, 471 Mich at 940. In any event, the point that the Lot 10 defendants highlight in citing *Clark*—that the Clarks here (like the plaintiff there) were represented by counsel in the negotiation of the settlement agreement—may very well factor into the overall assessment of whether a relief-worthy mistake occurred in this case. We do not believe the record as it now stands, however, is sufficient to enable that overall assessment, let alone meaningful appellate review of it.

In a similar vein, the parties dispute on appeal the meaning and import of different versions of the map of the property at issue. Given the record as it now stands, we do not find that dispute or its ultimate relevance to the Clark's entitlement to relief fit for meaningful appellate review.

[9] In light of this conclusion, we also must reverse and remand with respect to the trial court's award of attorney fees to the Lot 10 defendants under the settlement agreement, which provides that "[i]n any action or proceeding to enforce the terms of this Settlement Agreement, the prevailing party shall be entitled to its actual attorneys' fees and costs associated with the prosecution or defense of any such action or proceeding."

## V.  CONCLUSION

For the reasons discussed, we affirm the trial court's order granting a prescriptive easement to Cottonwood to place a 90-foot dock in the water in front of the 908 property but denying Cottonwood's claim of adverse possession, reverse the trial court's order denying the petition to reform the stipulated judgment and awarding attorney fees to the Lot 10 defendants, and remand for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Kristina Robinson Garrett
/s/ Michelle M. Rick
/s/ Philip P. Mariani